FILED IN OPEN COURT
U.S.D.C. - Atlanta

FEB 0 5 2026

Kevin P. Weimer, Clerk
By
Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

    *v.*

CURTIS DEXTER HULL

Criminal Information

No. 1:26-cr-16-MLB

THE UNITED STATES ATTORNEY CHARGES THAT:

**Count One**
**Conspiracy to Commit Wire Fraud**
**18 U.S.C. § 1349**

1. Beginning at least by in or about January 2022, and continuing until at least in or about February 2023, in the Northern District of Georgia and elsewhere, the defendant, **CURTIS DEXTER HULL**, did knowingly and willfully combine, conspire, confederate, agree, and have a tacit understanding with others known and unknown to the United States, to commit an offense against the laws of United States, that is: to devise and intend to devise a scheme and artifice to defraud lenders, and to obtain money and property from these lenders by means of materially false and fraudulent pretenses, representations, and promises, and by the omission of material facts, and for the purpose of executing this scheme, to cause wire communications to be transmitted in interstate commerce, in violation of Title 18, United States Code, Section 1343.

### Background

At all times relevant to this Information:

1. Defendant **CURTIS DEXTER HULL** was a commercial real estate developer primarily in the Atlanta metro area.

2. Debra Bryant was a licensed real estate agent in the Northern District of Georgia through the real estate brokerage firm JP & Associates Realtors.

3. Debra Farrell operated a financial company that facilitated obtaining "hard money loans" for borrowers seeking to buy and flip residential properties, to purchase rental properties, and for new construction. Hard money loans are high-interest loans secured by real property. They are primarily used in real estate transactions.

4. Leonard Medley was a closing attorney based in Atlanta, Georgia.

5. Individual-1 resided outside of the United States and created false and fraudulent documents, including fraudulent bank statements.

6. Alvarez Investment Group LLC ("Alvarez") was a Georgia limited liability company with a principal place of business in Conyers, Georgia. According to Georgia Secretary of State records, J.B. was Alvarez's purported organizer and registered agent. In actuality, **HULL** owned and operated Alvarez.

7. 2 Big Legacy LLC ("2 Big Legacy") was a Georgia limited liability company with a principal place of business in Lithonia, Georgia. C.F. was

2

the purported CEO and managing member of 2 Big Legacy. In actuality, **HULL** owned and operated 2 Big Legacy.

8. 2 Big Holdings LLC ("2 Big Holdings") was a Georgia limited liability company with a principal place of business in Lithonia, Georgia. C.F. was the purported sole member of 2 Big Holdings. In actuality, **HULL** owned and operated 2 Big Holdings.

9. The "MLK Property" was a residential apartment complex located on Martin Luther King Jr. Drive in southwest Atlanta, consisting of approximately 100 garden townhome-style apartments.

10. Lender-1 was a private money lender headquartered in Oregon who financed 2 Big Legacy's purchase of the MLK Property from Alvarez in or about June 2022.

11. Lender-2 was a private money lender who financed Alvarez's purchase of the MLK Property in or about November 2020.

12. The "Brittany Place Property" was a 36-building apartment complex located in Decatur, Georgia, with each building consisting of six one- or two-bedroom units.

13. Maple Key, LLC ("Maple Key") was a Georgia limited liability company with a principal place of business in Roswell, Georgia. Maple Key was the owner of the Brittany Place Property.

3

14. Spry Holdings, LLC ("Spry Holdings") was a Georgia limited liability company with a principal place of business in Alpharetta, Georgia. C.S. was the sole member of Spry Holdings.

15. Brittany Place 2022, LLC ("BP 2022") was a Georgia limited liability company with a principal place of business in Atlanta, Georgia. C.S. was the sole member of BP 2022. In actuality, **HULL** owned and operated BP 2022.

16. Lender-3 was a private money lender headquartered in California who financed 2 Big Legacy's purchase of two buildings within the Brittany Place Property in or about February 2022.

17. Lender-4 was a private money lender headquartered in the State of Washington who financed 2 Big Legacy's purchase of seven buildings within the Brittany Place Property between in or about February and March 2022.

18. Lender-5 was a private money lender headquartered in California who financed 2 Big Legacy's purchase of six buildings within the Brittany Place Property in or about May 2022.

19. Lender-6 was a private money lender headquartered in North Carolina who financed Spry Holdings' purchase of seven buildings within the Brittany Place Property in or about July 2022.

4

**Manner and Means**

20. Beginning no later than in or about January 2022 and continuing until at least in or about August 2022, **HULL**, Farrell, Bryant, Medley, Individual-1, and others executed a scheme to fraudulently obtain hard money loans for the purported sale and purchase of various residential and commercial properties, including the sale of MLK Property from Alvarez to 2 Big Legacy involving Lender-1 ("Transaction-1"), the purported sale of multiple units within the Brittany Place Property from Maple Key to 2 Big Legacy in a series of separate transactions involving Lender-3, Lender-4, and Lender-5 (collectively "Transaction-2"), and the sale of buildings within the Brittany Place Property from Maple Key to Spry Holdings involving Lender-6 (collectively "Transaction-3").

21. To obtain hard money loans from various institutions, including Lender-1 for the MLK Property and Lender-3, Lender-4, Lender-5, and Lender-6 for the transactions involving the Brittany Place Property, **HULL** and others, submitted and caused to be submitted false and fraudulent loan applications that included multiple material misrepresentations, including about the identity of the actual borrower and fabricated bank statements. If Lender-1, for example, had known that the Transaction-1 was not arm's length, *i.e.*, that the borrower/buyer and seller were on both sides of the transaction, that the borrower, C.F., was a straw purchaser, that the conspirators had submitted fabricated bank statements, and that

5

the loan proceeds were not used for the intended purpose of financing the Transaction, Lender-1 would not have approved the loan.

22. Likewise, with respect to Transaction-2, if Lender-3, Lender-4, and Lender-5 had known, among other things, that the borrower, C.F., was a straw purchaser, as **HULL** knew; that the conspirators had submitted fabricated bank statements; that Medley had prepared false and fraudulent settlement statements; that 2 Big Legacy never made the stated contributions; and that the loan proceeds were not used for the intended purpose of financing Transaction-2, Lender-3, Lender-4, and Lender-5 would not have approved the loans.

23. Similarly, with respect to Transaction-3, if Lender-6 had known that the borrower, C.S., was a straw purchaser, as **HULL** knew; that the conspirators had submitted fabricated bank statements, and that Medley had prepared false and fraudulent settlement statements, Lender-6 would not have approved the loans.

<u>MLK Property – Transaction-1</u>

24. Bryant was the listing agent for the MLK Property. On or about March 11, 2022, J.B., on behalf of Alvarez, executed an exclusive seller brokerage agreement with Bryant. The brokerage agreement stated that the MLK Property was being listed for $17,000,000. Under the terms of the

6

brokerage agreement, Bryant was entitled to a commission equal to 1% of the sales price.

25. Beginning in or about February 2022, **HULL** directed Farrell to work with brokers to identify potential lenders to finance Transaction-1.

26. Farrell corresponded with other brokers in her network to obtain financing for **HULL** to purchase the MLK Property through 2 Big Legacy. Through Farrell's network, she identified Lender-1 as a potential source of financing. In or about March 2022, an application for financing was submitted to Lender-1 with C.F. listed as the owner of 2 Big Legacy.

27. As part of the lending process, Lender-1 required bank statements from the borrower, 2 Big Legacy, and its purported owner, C.F. On or about February 3, 2022, Farrell emailed C.F.'s actual bank statements for C.F.'s business to **HULL** and Bryant, including a December 2021 bank statement for C.F.'s business account at JPMorgan Chase account x3536 ("Chase x3536"). As of December 31, 2021, C.F.'s Chase x3536 account showed an ending balance of $623.25. Throughout the lending process, Farrell requested that **HULL** and Bryant provide specific bank statements for C.F.'s business account, 2 Big Legacy, and 2 Big Holdings. **HULL**, not C.F., was the lone signatory for the bank accounts in the names of 2 Big Legacy and 2 Big Holdings.

7

28. Bryant found Individual-1 on Fiverr, a freelance services marketplace, who was willing to prepare fraudulent bank statements. Bryant thereafter emailed Individual-1 a copy of C.F.'s actual Chase x3536 December 2021 bank statement, from which Individual-1 generated fake bank statements for Chase x3536 account for December 2021, January 2022, February 2022, March 2022, April 2022, and May 2022, fraudulently showing ending balances of $6,000,623,.25, $6,002,595.14, $8,000,638.25, $8,001,610.14, $8,005,701.98, and $8,006,638.25, respectively. In reality, the balance in Chase x3536 account for each month was, respectively, $623.25, $11,978.52, $3,457.34, $325.84, $506.10, and $200.16. Bryant paid Individual-1 to make these fraudulent bank statements via Western Union. On various dates, beginning in or about February 2022, Bryant emailed **HULL** and Farrell the fraudulent bank statements for the Chase x3536 account.

29. On multiple occasions, between approximately February 2022 and May 2022, Farrell requested from Bryant (and in some cases **HULL** and Bryant) bank statements for 2 Big Legacy and 2 Big Holdings. Bryant provided fake and fraudulent bank statements for both entities. By way of example:

> a. On or about March 3, 2022, Bryant emailed Farrell (copying **HULL**) purported December 2021 and January 2022 bank statements for 2 Big Holdings' Bank of America account x5037

8

("BOA x5037"), showing ending balances over $6.8 million for each month. In actuality, the BOA x5037 account was closed in or about October 2021.

b. On or about April 11, 2022, Farrell requested from **HULL** and Bryant a copy of the March 2022 bank statement for 2 Big Legacy's Bank of America account x4804 ("BOA x4804"). In response, Bryant emailed **HULL** a fraudulent March 2022 statement for the BOA x4804 account showing a balance of $3,070,311.92, when the actual balance was $523,934.85. On or about April 12, 2022, **HULL** forwarded to Farrell the fraudulent March 2022 BOA x4804 statement he had received from Bryant.

c. On or about May 4, 2022, **HULL** emailed Bryant a fraudulent April 2022 statement for C.F.'s Chase x3536 account that falsely showed the ending balance was $8,005,701.98.

30. During the lending process, Farrell electronically submitted and caused to be electronically submitted to Lender-1 the false and fraudulent bank statements for the Chase x3536, BOAx5037, and BOA x4804 accounts for the purpose of misleading Lender-1 into believing that the purported borrower, C.F., had millions in liquid assets. **HULL**, Farrell, Bryant, and

9

Medley knew these bank statements were false and fraudulent when they were ultimately submitted to Lender-1.

31. Medley was responsible for preparing the certified settlement statement for Transaction-1. The settlement statement was intended to provide a true and accurate breakdown of the financial aspects related to the Transaction-1, including disclosing the following information: the sale price, loans charges, any loan payoffs, title charges, recording fees, and other miscellaneous charges.

32. In preparation for the closing on the MLK Property and prior to Medley releasing any loan proceeds from Lender-1, Medley was required to follow Lender-1's closing instructions, which included preparing a certified settlement statement for the Transaction. Medley initialed after each of the Lender-1's closing instructions acknowledging he followed the instruction. Medley prepared and later submitted the certified settlement statement to Lender-1 for the Transaction knowing it contained false information.

33. For example, Lender-1's closing instructions directed Medley to confirm all liens, encumbrances, and mortgages on the MLK Property were either cleared prior to closing or paid through the closing of the escrow. Medley knew that Alvarez owed over approximately $9 million to Lender-2 from when Alvarez purchased the property in November 2020

10

because Medley also the closing attorney for that transaction. Medley
failed to disclose the outstanding loan to Lender-2 on the settlement
statement.

34. Lender-1's closing instructions also required Medley to provide a
certified copy of the settlement statement disclosing how the loan proceeds
were disbursed at the Transaction's closing. Medley falsely represented in
the certified settlement statement that the buyer, 2 Big Legacy, had
transferred approximately $5.9 million to Medley toward the purchase
price, and Medley had paid approximately $16.9 million to the seller,
Alvarez, at closing. In actuality, Medley knew that he neither received $5.9
million from 2 Big Legacy nor paid $16.9 million to Alvarez at the closing.

35. Medley was further aware, but did not disclose to Lender-1, that the
sale of the MLK Property from Alvarez to 2 Big Legacy was not an arm's
length transaction because **HULL** was on both sides of the transaction.

36. On or about June 1, 2022, Lender-1 caused an electronic wire
transfer of $11,900,000 to be transmitted to Medley's account.

37. The funds received by Medley from Lender-1 were not used in the
manner set out in the certified settlement statement prepared by Medley.
Instead of paying Alvarez $16.9 million in proceeds as the seller of the
MLK Property, a substantial portion of the funds were used to pay Lender-
2. On or about July 1, 2022, Medley wired $10,324,876.79 to Lender-2.

11

Lender-1 would not have disbursed the loan proceeds to Medley if it knew
the certified settlement statement contained false information.

38. After the closing, on or about June 9, 2022, Farrell received $118,955
for her role in Transaction-1.

39. On or about June 9, 2022, Medley wrote a check for $170,000 to JP &
Associates Realtors, as the listing agent for the MLK Property. After the
closing, on or about June 15, 2022, Bryant received $135,250 for her role in
the Transaction-1.

40. After not receiving the first scheduled loan payment from 2 Big
Legacy in August 2022, Lender-1 began foreclosure proceedings on the
MLK Property, and ultimately took possession of the property.

Brittany Place Property – Transaction-2

41. Beginning no later than in or about January 2022, **HULL** directed
Farrell to work with brokers to identify potential lenders to finance
Transaction-2.

42. Farrell corresponded with other brokers in her network to obtain
financing for **HULL** to purchase multiple units within the Brittany Place
Property through 2 Big Legacy. Through Farrell's network, she identified
Lender-3, Lender-4, and Lender-5 as potential sources of financing.

12

43. As part of the lending process, Lender-3, Lender-4, and Lender-5 required bank statements from the borrower, 2 Big Legacy, and in some instances, bank statements for 2 Big Legacy's purported owner, C.F.

44. For example, on or about February 7, 2022, Farrell emailed Bryant and **HULL** and requested a copy of 2 Big Legacy's January 2022 Bank of America bank statement. On or about February 8, 2022, Bryant emailed **HULL** and Farrell a purported copy of 2 Big Legacy's January 2022 bank statement showing an ending balance of $3,065,178.63, when in actuality the ending balance in 2 Big Legacy's account in January 2022 was $685,739.90.

45. During the lending process, Farrell electronically submitted and caused to be electronically submitted to Lender-3 and Lender-4 the false and fraudulent January 2022 Bank of America statement for 2 Big Legacy for the purpose of misleading Lender-3 and Lender-4 into believing that the purported borrower, C.F., had millions in liquid assets. **HULL**, Medley, Farrell, and Bryant knew the bank statement was false and fraudulent when it was ultimately submitted to Lender-3 and Lender-4.

46. Similarly, on or about April 11, 2022, Farrell emailed **HULL** and Bryant and requested a copy of 2 Big Legacy's March 2022 Bank of America bank statement. On or about the same day, Bryant emailed **HULL** a purported copy of 2 Big Legacy's March 2022 statement showing an

13

ending balance of $3,070,311.92.  In actuality, 2 Big Legacy's ending
balance in March 2022 was $423,934.85.  On or about April 12, 2022, **HULL**
forwarded the fraudulent bank statement from Bryant to Farrell.

47. During the lending process, Farrell electronically submitted and
caused to be electronically submitted to Lender-5 the false and fraudulent
March 2022 Bank of America bank statement for 2 Big Legacy for the
purpose of misleading Lender-5 into believing that the purported
borrower, C.F., had millions in liquid assets.  **HULL**, Medley, Farrell, and
Bryant knew the bank statement was false and fraudulent when it was
submitted to Lender-5.

48. As part of closing Transaction-2, which constituted a series of
separate transactions involving the Brittany Place Property, Medley
received closing instructions from Lender-3, Lender-4, and Lender-5,
which Medley was required to follow before distributing any loan
proceeds from these lenders.

49. For example, on or about May 5, 2022, Lender-5 emailed Medley a
list of items to be completed, including substantiating that 2 Big Legacy
had provided the required funds to close the transaction. Medley
responded that same day stating he was working on completing the
required items.

14

50. On or about May 10, 2022, Medley forwarded Lender-5 an email Medley received from his bank, First Citizens Bank & Trust Co. ("First Citizens") that stated he had received a wire transfer for $2,465,000 from 2 Big Legacy. Medley failed to disclose to Lender-5 that 2 Big Legacy did not actually provide these funds, but rather Medley was the source of the funds. Medley failed to disclose that he wired funds from an account he controlled to 2 Big Legacy, an account controlled by HULL, which 2 Big Legacy in return wired back to Medley.

51. Specifically, on or about May 9, 2022, Medley wired $2,464,131.03 from one of his IOLTA accounts to 2 Big Legacy's Bank of America account. On or about May 10, 2022, 2 Big Legacy wired $2,465,000 to Medley's First Citizens account. As a result of these two wire transfers, Medley falsely made it appear to Lender-5 that 2 Big Legacy provided the required funds to close the transaction.

52. Lender-3, Lender-4, and Lender-5's closing instructions also required Medley to provide a certified copy of the settlement statement disclosing how the loan proceeds were disbursed at the closings. Medley prepared false and fraudulent settlement statements indicating, among other things, that the loan proceeds had been distributed to Maple Key and the transactions (collectively Transaction-2) had closed. In actuality, as Medley knew, Maple Key did not receive the loan proceeds to close on the

15

sale of the properties. Medley in fact failed to properly record the transactions as required by Lender-3, Lender-4, and Lender-5, despite representing to the contrary that he in fact had done so.

53. **HULL**, Medley, and others also failed to disclose to Lender-3, Lender-4, and Lender-5 the existence of a purported agreement between 2 Big Legacy and Maple Key under which Maple Key supposedly agreed to allow 2 Big Legacy to use the proceeds from the closings. Lender-3, Lender-4, and Lender-5 would never have approved the loans had they known that 2 Big Legacy had not used the proceeds to close any of the transactions with Maple Key.

54. In or about February 2022, Lender-3 disbursed over $2 million in loan proceeds to via electronic wire transfers to Medley's account. Between in or about February 2022 until in or about March 2022, Lender-4 caused electronic wire transfers totaling over $6.4 million to be transmitted to Medley's account.  In May 2022, Lender-5 caused electronic wire transfers totaling over $5 million to be transmitted to Medley's account.

Brittany Place – Transaction-3

55. Beginning on a date unknown but no later than in or about June 2022, **HULL** directed Farrell to work with brokers to identify potential lenders to finance Transaction-3.

16

56. Farrell corresponded with other brokers in her network to obtain financing for **HULL** to purchase multiple buildings within the Brittany Place Property through BP 2022. Through Farrell's network, she identified Lender-6 as a potential source of financing.

57. As part of the lending process, Lender-6 required bank statements from the borrower, C.S., and the C.S.'s company, Spry Holdings. For example, on or about July 12, 2022, Farrell emailed Spry Holdings's actual bank statements to **HULL** and Bryant. The bank statements were for April, May, and June 2022 for Spry Holdings's Capital One bank account showing ending balances of $65,435.24, $56,236.24, and $53,828.73, respectively. In the email, Farrell asked **HULL** and Bryant to "update" the bank statements.

58. Bryant worked with Individual-1 to create false and fraudulent April, May, and June 2022 Capital One bank statements for Spry Holdings. On or about July 12, 2022, Individual-1 emailed Bryant fraudulent bank statements for April, May, and June 2022 for Spry Holdings's Capital One account showing ending balances of $5,065,435.24, $5,056,236.24, and $5,053,828.73, respectively. On or about July 13, 2022, Bryant emailed the three fake bank statements created by Individual-1 to **HULL** and Farrell.

59. During the lending process, Farrell electronically submitted and caused to be electronically submitted to Lender-6 the false and fraudulent

17

May and June 2022 Capital One bank statements for Spry Holdings for the purpose of misleading Lender-6 into believing that the purported borrower, Spry Holdings, had millions in liquid assets. **HULL**, Medley, Farrell, and Bryant knew the bank statements were false and fraudulent when they were ultimately submitted to Lender-6.

60. In preparation for the closing of Transaction-3, and prior to Medley releasing any loan proceeds received from Lender-6, Medley was required to follow Lender-6's closing instructions. Lender-6's closing instructions required Medley to provide a certified copy of the settlement statements disclosing how the loan proceeds were disbursed at Transaction-3's closing.

61. On or about July 25, 2022, Lender-6 caused an electronic wire transfer totaling over $8 million to be transmitted to Medley's account. Lender-6 would not have disbursed the loan proceeds to Medley if it knew the certified settlements contained false information.

62. Shortly after wiring the funds to Medley, Lender-6 learned there were potential improprieties with Transaction-3, and on or about July 28, 2022, Lender-6 informed Farrell that the loan proceeds needed to be returned. On or about August 1, 2022, Medley wired the entire loan proceeds back to Lender-6.

All in violation of Title 18, United States Code, Section 1349.

## Count Two
## Endeavoring to Obstruct the Due Administration of Justice
## 18 U.S.C. § 1503

63. On or about August 9,2024, in Lackawanna County, in the Middle District of Pennsylvania, the defendant, **CURTIS DEXTER HULL**, did knowingly and intentionally corruptly endeavor to influence the due administration of justice in *United States v. Asiana Christine Williams*, No. 3:23-CR-27, in the United States District Court for the Middle District of Pennsylvania, by placing a document on the vehicles of petit jurors during the trial which contained false information regarding the case and the parties.

All in violation of Title 18, United States Code, Section 1503.

### Forfeiture

64. Upon conviction of one or more of the offenses alleged in Counts One through Two of this Information, the defendant, **CURTIS DEXTER HULL**, shall forfeit to the United States of America, pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any property, real or personal, which constitutes or is derived from proceeds traceable to such offenses. The property to be forfeited includes, but is not limited to, the following:

MONEY JUDGMENT: A sum of money in United States currency, representing the amount of proceeds obtained

19

as a result of the offenses alleged in Counts One

through Two of this Information.

65. If any property subject to forfeiture, as a result of any act or omission of the defendant:

     a.  cannot be located upon the exercise of due diligence;

     b.  has been transferred or sold to, or deposited with, a third party;

     c.  has been placed beyond the jurisdiction of the Court;

     d.  has been substantially diminished in value; or

     e.  has been commingled with other property which cannot be divided without difficulty;

the United States of America intends, pursuant to Title 21, United States Code, Section 853(p), as incorporated by Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of said defendant up to the value of the forfeitable property.

THEODORE S. HERTZBERG
United States Attorney

ALEX R. SISTLA
*Assistant United States Attorney*
Georgia Bar No. 845602

600 U.S. Courthouse
75 Ted Turner Drive SW
Atlanta, GA 30303
404-581-6000; Fax: 404-581-6181

20